UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | Criminal No. 05-CR-127 (JNE/SRN) |
| **Plaintiff,** | |
| v. | **REPORT & RECOMMENDATION** |
| **Efrain Arias-Perez, a/k/a Erasmo Coroba (02)** | |
| **Defendant**. | |

Erika Mozangue, Esq., on behalf of Plaintiff

Lyonel Norris, on behalf of Defendant Efrain Arias-Perez

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on Defendant's letter motion to join the Motion to Dismiss [Doc. No. 32] filed by his former co-defendant, Cesar Godinez-Perez. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.[1]

## I.  PROCEDURAL BACKGROUND

An indictment dated April 19, 2005, was filed against Defendant charging him with one count of

---

[1] This matter is set to be tried before the Honorable Joan N. Ericksen, United States District Court Judge for the District of Minnesota, on a date to be determined.

1

transportation of illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and 18 U.S.C. § 2.

Trooper David Baker, Iowa Department of Public Safety, and Special Agent Michael Fischels, Department of Homeland Security, Immigration and Customs Enforcement, testified at the criminal motions hearing.

The following exhibits were received in evidence:

Govt. Ex. 1: Photograph of Chevrolet pick-up truck;

Govt. Ex. 2: Photograph of front portion of interior of Chevrolet pick-up truck and passenger;

Govt. Ex. 3: Photograph of rear portion of interior of Chevrolet pick-up truck and passengers; and

Govt. Ex. 4: Photograph of bed portion of pick-up truck and passengers.

## II. BACKGROUND

Trooper David Baker, a state trooper with the Iowa Department of Public Safety, testified that on March 22, 2005, he was on routine patrol on Interstate 35, in a marked car, traveling northbound. At approximately 10:30 a.m., he observed a Chevrolet pick-up truck with dark-tinted side windows on the passenger and driver side doors and a heavily tinted topper over the bed of the pick-up. (See Govt. Ex. 1.) The Chevy pick-up, which appeared to be traveling the speed limit, passed Trooper Baker, also going northbound. Based on his experience and his visual observation of the truck, Trooper Baker believed it to be in violation of Iowa Code § 321.438, which prohibits the operation of a motor vehicle on the highway containing excessively dark front, side or wing windows. According to Trooper Baker, guidelines adopted by the Iowa Department of Public Safety require vehicle windows to transmit at least seventy percent of the light.

Trooper Baker activated his patrol car lights and pulled over the Chevy pick-up to the shoulder of the highway. As he walked to the vehicle, he used a tint meter machine on the passenger side window of the truck to get a reading of the amount of light capable of shining through the window. The reading on his meter indicated that the window transmitted only fifteen percent of the light. Having verified that the window tint violated the statute, he informed the occupants of the reason for the stop. He observed three persons sitting in the front row of the pick-up, one of whom sat on the center console, and five persons sitting on the bench seat in the second row of the pick-up cab area. (See, e.g., Govt. Exs. 2 & 3.)

Trooper Baker asked the occupants for identification. Noting a language barrier, in that the occupants all appeared to speak Spanish and Trooper Baker does not, he indicated by gestures that he wanted to see identification. The driver produced a Mexican chauffeur's license, bearing the name Cesar, though Trooper Baker could not recall if Cesar was the first or last name of the driver. None of the passengers could produce identification. Trooper Baker identified Defendant as a passenger in the front of the pick-up, sitting next to the passenger side window.

Next, Trooper Baker asked the driver to exit the truck and they met in the space between the pick-up truck and the patrol car. Trooper Baker testified that because of the cramped occupancy of the cab area, no signs of luggage and the fact that he could not see into the topper, he asked the driver if anyone was in the back of the pick-up and asked the driver to open the topper. Trooper Baker did not display any weapons or handcuff anyone. At no time did Defendant step into the patrol car. The driver complied with the trooper's request, opening the topper to reveal ten people lying under a blanket.

Inside his patrol car, Trooper Baker contacted the Immigration and Naturalization Service (INS) in Des Moines, Iowa. The INS agent asked that Trooper Baker allow the pick-up truck to continue traveling, but that he follow it to the Minnesota border so that a Minneapolis INS agent could follow it from there. At the border, Trooper Baker called the Minneapolis INS and told them of the pick-up truck's location.

Michael Fischels, Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, testified that on March 22, 2005, the Bloomington, Minnesota INS Office received a call from the Iowa INS describing a pick-up truck traveling near the Iowa-Minnesota border suspected of transporting illegal aliens. Special Agent Fischels testified that he was aware that Trooper Baker had been instructed to allow the vehicle to continue traveling in order to determine where the vehicle was going in Minnesota. Special Agent Fischels, driving an unmarked green Chevrolet Impala, began following the pick-up truck as it traveled north on I-35, just south of the Minnesota border. He observed the truck turn west onto Interstate 90 and eventually exit in Worthington, Minnesota.

In Worthington, the pick-up was driven to the Wal-Mart parking lot. Special Agent Fischels parked in an adjacent lot and observed several persons exit the pick-up, go into Wal-Mart and return. In addition, one occupant of the pick-up, later identified as Misael Perez, exited the pick-up and got into a vehicle that pulled up next to the truck. Special Agent Fischels followed that vehicle to a small private residence approximately a half mile from Wal-Mart. Several other surveillance units remained with the pick-up truck. Misael Perez spoke with Special Agent Fischels, telling him that he had come from Guatemala and was smuggled from the United States-Mexico border to his relatives' home in

Worthington. He stated that the smuggling involved a payment of $1200-1300 which his aunt and uncle paid at the Wal-Mart parking lot.

Officers observing the pick-up truck noted that it stopped at a gas station for gas, then traveled east on I-90. Having concluded his discussion with Misael Perez, Special Agent Fischels traveled along I-90 to catch up with the pick-up truck. The truck was stopped by law enforcement officers on the shoulder of I-90, just east of Austin, Minnesota. Special Agent Fischels testified that the truck contained three occupants in the front row of the interior, five occupants in the extended cab area of the interior and the remaining occupants of the truck were in the bed of the pick-up, under the topper. Having spoken with the occupants in Spanish, Special Agent Fischels determined that all of the occupants were undocumented aliens. Special Agent Fischels stated that Cesar Godinez-Perez was the driver and Defendant was a passenger seated in the front row of the truck. Both Defendant and Godinez-Perez were placed under arrest.

### III. DISCUSSION

#### A. Motion to Dismiss Related to Traffic Stop

Defendant moves for an order to dismiss due to an invalid traffic stop, claiming a violation of the Fourth Amendment. Specifically, Defendant argues that once a police officer's suspicions are dispelled, a defendant is free to leave. ((Def. C. Godinez-Perez Mem. Supp. Mot. Dismiss at 1, citing United States v. Wilson, No. CR01-0067, 2002 U.S. Dist. LEXIS 25428 (N.D. Iowa, Dec. 27, 2002)). Defendant contends that after Trooper Baker stopped the vehicle due to tinted windows, he then released it. Because Trooper Baker's reasonable, articulable suspicion for the stop was terminated, Immigration and Customs Enforcement Agents who subsequently followed and stopped the

5

vehicle violated the Fourth Amendment.

        1.     **The Stop**

"An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle." United States v. Barragan, 379 F.3d 524, 528 (8th Cir. 2004). Once a vehicle is stopped, an officer may detain the offending motorist while completing a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. Id.

If the responses given and the circumstances raise the officer's suspicions, the officer may broaden the inquiry and satisfy those suspicions. United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993).

In this case, the Court has no reason to question the testimony of Trooper Baker that he stopped the vehicle because of excessively-tinted windows. He testified that his assessment was based on several years' experience involving enforcement of Iowa Code § 321.438, and was confirmed by his testing of the passenger-side window. When Trooper Baker asked for identification, only the driver produced identification, in the form of a Mexican chauffeur's license. Trooper Baker also observed that the cab area of the truck contained an unusually high number of occupants and no luggage in the cramped quarters. In addition, the occupants' general inability to communicate in English and their lack of identification, aroused his suspicion that they might be illegal aliens. Moreover, although it is not illegal in Iowa for a pick-up topper to have tinted windows, Trooper Baker could not see into the back of the pick-up bed which was covered by a topper with tinted windows. Given these

factors, it was reasonable for Trooper Baker to ask the driver, Cesar Godinez-Perez, if anyone was in the back of the pick-up truck and to open the topper.

Officers may conduct a search without a warrant or probable cause based upon an individual's voluntary consent, and any evidence discovered during such a search may be seized and admitted at trial. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Bradley, 234 F.3d 363, 366-67 (8th Cir. 2001).

Generally, anyone who has a reasonable expectation of privacy in the place being searched can consent to a warrantless search, and any person with common authority over the place or effects to be searched can give valid consent. See United States v. Matlock, 415 U.S. 164, 171 (1974); United States v. Moran, 214 F.3d 950, 951-52 (8th Cir. 2000). Common authority rests in each person whose mutual use of the property demonstrates "joint access or control for most purposes." See Matlock, 415 U.S. at 171-72, n. 7; United States v. Beshore, 961 F.2d 1380, 1382-83 (8th Cir. 1992), cert. denied, 506 U.S. 884 (1992). Courts presume that other users of the property have assumed the risk that areas under common control may be searched. Id.

Here, Defendant was a passenger in the vehicle and was a joint user of the vehicle. Cesar Godinez-Perez, the driver, possessed authority as the driver of the vehicle to consent to the search. Trooper Baker testified that he asked the driver to open the back of the topper. There is no evidence that Mr. Godinez-Perez was intimated or forced to open the topper.

When the topper was open, Trooper Baker observed an additional ten persons, which further added to his belief that the vehicle was being used for the transportation of illegal aliens.

  **2.**   **Dispelling of Suspicion**

Defendant cites Wilson, 2002 U.S. Dist. LEXIS 25428 at *7-8, which sets forth the following, well-settled Fourth Amendment principle: First, upon conducting a legitimate stop, police may ask basic questions necessary to identify the occupants and to view license, registration and proof of insurance papers. Second, once the legitimate grounds for stopping a suspect have dissipated or been dispelled, the police must release the suspect unless articulable suspicion of other wrongdoing has arisen in the interim. Id. On the other hand, if the officer's suspicions are aroused in the course of a routine investigation, "the officer is entitled to expand the scope of the stop to ask questions unrelated to the original traffic offense, and consent given in the course of such questioning is valid so long as it is voluntary." United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999), cert. denied, 528 U.S. 958 (1999).

In United States v. Peltier, 217 F.3d 608, 609 (8th Cir. 2000), a police officer observed the defendant driving a pick-up truck with no license plates. Because the pick-up had darkly-tinted rear windows, the officer could not see the defendant's properly displayed temporary registration sticker. The officer explained the reason for the stop, at which point the defendant stated that he had been pulled over before for the same problem. The officer then verified the validity of the registration sticker, but noticed in the interim that the defendant was not wearing a seatbelt. While writing a ticket for the seatbelt violation, the officer detected the odor of marijuana coming from the cab on the truck, which provided probable cause for a search of the truck, revealing drugs and related paraphernalia.

The trial court suppressed the evidence, finding that the officer had dispelled his suspicion about the registration sticker before he approached the driver, observed the seatbelt violation, then smelled the marijuana. Id. at 609. The Eighth Circuit reversed and remanded, holding that because the officer

lawfully stopped the defendant to investigate a possible registration violation, he could properly detain and ticket him for the seatbelt violation he observed while verifying that Peltier had a valid and properly displayed registration sticker. Id. at 610.

Similarly, in Allegree, a police officer stopped a defendant driving at 1:23 a.m., because his vehicle had blue headlights which are only permitted on emergency vehicles in Iowa. 175 F.3d at 649. Allegree responded that the lights were purple, not blue, and only the defendant's statements led the officer to consider whether the lights were any color other than blue. The officer then asked to see identification from both occupants and the registration papers for the car. Difficulty in reading the defendant's faded license and other problems escalated to reasonable suspicion and, ultimately, consent to search the car, leading to the discovery of methamphetamine. The Eighth Circuit held that the detention was legal, the questioning of the defendant was reasonable, in light of the sequence of events, and the consent to search was voluntary. Id. at 650-51.

Although the Allegree decision does not specifically discuss whether the suspicion of the officer was at any time dispelled, the Wilson decision states that Allegree makes clear that a police officer is not obligated to dispel suspicions of a traffic offense before engaging the driver and passengers in routine questioning. Wilson, 2002 U.S. Dist. LEXIS 25428, at *14-15.

Here, Trooper Baker's stop of the pick-up truck was valid, as discussed above. While he initially stopped the vehicle due to the tinted window violation, his suspicions as to the tinting were confirmed, rather than dispelled, by measuring the level of light transmission. As part of the stop, he was not obligated to dispel those suspicions before engaging the driver and passengers in routine questioning. Allegree, 175 F.3d at 650. Rather, Trooper Baker was free to make routine inquiries and

identify the driver and occupants. Based on his observations of the high passenger occupancy of the interior of the truck, the non-English speaking abilities of the occupants and the lack of identification, his suspicions about transportation of illegal aliens were justifiably aroused. Furthermore, his suspicions were heightened when the driver consented to opening the topper of the truck and another ten passengers were revealed.

Trooper Baker then contacted an INS agent in Des Moines to discuss his suspicions. The INS agent instructed him to allow the vehicle to continue traveling so that the Minnesota INS could continue to follow the truck. This is not a case where an officer's suspicions were dispelled or dissipated in any form. Rather, while the initial stop involved tinted windows – a hunch which was corroborated by special equipment – Trooper Baker's suspicions regarding immigration violations evolved during the course of routine questioning. While he released the vehicle, he continued to follow it. The coordinated efforts between the Iowa and Minnesota INS offices in following the pick-up truck indicate that law enforcement <u>maintained</u> their suspicions, rather than dispelled them. Subsequent surveillance only confirmed those suspicions, when Special Agent Fischels spoke with one of the passengers in Worthington and learned more about his transportation from the Mexican border. Based on all of the above, the Court finds that the traffic stop was valid under the Fourth Amendment and that Defendant's motion to dismiss should be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1. Defendant's letter motion, joining in the Motion to Dismiss [Doc. No. 32] filed by his former co-defendant, Cesar Godinez-Perez, be **DENIED.**

Dated: June 21, 2005

          s/Susan Richard Nelson
          SUSAN RICHARD NELSON
          United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by **July 6, 2005** after being served with a copy thereof. The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.